## Garman v. Commonwealth.

(Decided February 28, 1919.)

### Appeal from Warren Circuit Court.

1. Criminal Law—Mental Condition of Defendant—Evidence.— Question of appellant's mental condition having been submitted to the jury under proper instruction, the record examined, the

court finds there is no ground to reverse the judgment of the jury finding appellant guilty.

2.  Criminal Law—Connected Criminal Acts.—Where several criminal acts committed by the accused are so connected with respect to time and locality as to form an inseparable transaction and a complete account of the offense charged in the indictment cannot be given without detailing the particulars of such acts, evidence of same is admissible to prove the whole general plan.

3.  Criminal Law—Evidence—Admonition.—The admonition of the court as to the admission of testimony relative to the second shooting was proper; even though the language used was inapt it was not prejudicial to the accused.

WRIGHT & McELROY and SIMS, RODES & SIMS for appellant.

CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Affirming.

At the September, 1918, term of the Warren circuit court appellant, A. A. Garman, was convicted of the willful murder of Ed Johnson and his penalty fixed at death.

The grounds for reversal of that judgment urged by counsel for appellant are as follows:

(1) The verdict is flagrantly against the evidence, it being claimed that at the time of the killing plaintiff was of unsound mind and not responsible for his acts or conduct.

(2) Because of error of the court in admitting details of a second shooting on the same day.

(3) Because of the court's error in not properly admonishing the jury as to the admission of the evidence of the second shooting.

1. The question of insanity. About sixteen years before the killing it appears that appellant was thrown from his horse, and was rendered unconscious for some time; that thereafter he was not the same. Instances of his peculiarities we will presently indicate from the testimony.

On the Monday preceding the killing, which took place on Wednesday, August 7, 1918, armed with a pistol and knife, both in a belt and scabbard, with a black bag hung over his shoulders, containing about 160 loads of ammunition, and in his shirt sleeves, appellant went to the court house in Bowling Green and there talked with the deputy jailer. On Tuesday, armed and equipped in like manner as on the previous day, he again visited the

court house, both in the morning and afternoon. On Wednesday morning the killing took place on his farm, the decedent being his tenant. Shortly after the killing he sought shelter in a thicket, a short distance from the scene of the killing, and at this latter place he was later found by members of a party who were hunting for him; before he was captured he shot a member of the posse.

Testifying in his own behalf appellant states that he is 80 years of age. He identified his Winchester rifle, knife and pistol; that for a year preceding the killing, whenever he went out in his buggy, he took his Winchester rifle. To use his own language: "Because an automobile run into me and knocked me out of the buggy and hurt my horse and me too, and I wanted them to keep on their side of the road." He bought the knife because he was expecting to kill a goat, and he purchased the pistol because he thought he could use it if he needed it, and if not there would be no harm done; he was advised he had a right to carry these weapons provided he did not conceal them, and he was always careful that he did not carry them concealed.

He states in detail his visits to the court house and other places on Monday and Tuesday before the killing. He carried his Winchester rifle every time he went to the farm; he states he had smothering spells and that when they would come on him he would get up at night and work his garden by lantern light. He says he has had these ever since the time he was thrown from the horse. He went to his farm on Wednesday morning, and in response to a question from his counsel to tell the jury all about it, from start to finish, he says:

"Well now when I went there Wednesday morning I went to the gate and it was all wired up but not as bad as it had been; well I opened that so I could go in, and I went on to the barn and I had a big wagon and I had tobacco on each side of the barn and had a passway right through the shed and I asked him (referring to his tenant, Johnson) to take the wagon out and he said, 'yes, he might take it out,' and went on to the house, and me and this other fellow was there and we talked a little and I had some steeples and bolts and I took them to my room and come on back, and when I come back I left my horse standing there. Now the barn here you had to go right through the shed and when I went to the house the road went this way to the house, it made a little

crook right here, and while I was going to the house my horse was standing here, and while I was going back 1 met my horse there picking at the path and I come on and got hold of the horse and turned him around right in front of this shed, and I never looked back or nothing at all, and I went to unhitching him, and when I was unhitching him I stepped in front to undo the backing strap and then I turned as quick as I could and there he was right there and cocked his gun and said, 'I am going to kill you,' and I said, 'I don't want you to do that,' and Igollys he come right on towards the horse's head and I told him I didn't want him to kill me, and I was standing there right there ready for him and he had his gun. I can show you exactly how it was; he had his gun right that way, drawed on me, and Igollys, then he got back of the horse and when he come around the horse that way I shot him right there, for I seen I had it to do or he would kill me.'' He says he shot him with a Winchester rifle, and his wife ''come and hollered and kept hollering and I never said a word to her and she hollered for Harrison, and then for Hays, and she said for them to get a doctor and nobody come and nobody answered her.''

He finished unhitching his horse and turned him loose; that later he went to take him to the pasture but could not find him. He passed by the house and came back to the place of the shooting and he thus relates what happened then: ''A. Yes, sir, and when I come on back there he was getting his breath pretty hard, and she said, 'He is dying pretty hard,' and I shot him again. Q. Why? A. To keep him from suffering. Q. How did he fall when he was shot the first time? A. He run back four or five steps and fell on his back and had his gun right on his arm and pointing towards me. Q. Did you believe you were doing right the first time you shot him? A. Yes, sir, I did, for I thought if I didn't he would shoot me, for he had threatened me before that; said he would knock me in the head. Q. Did you think you were doing right the second time you shot him? A. Well, Igollys, to get him out of his misery; I seen he was going to die.'' After this he called a man by the name of Denham and insisted upon his coming over and looking at Johnson.

In response to a question as to where he went after talking to Denham he says: ''I come back and looked for

my horse again and couldn't find him. When he left I come back to see if anyone was there but his wife, and I come back then to Hays' to see if they was there, and I just got over there and got me a high place where I could see clear to my house and I set down, and I could see them running in every direction, and one fellow ran right in four feet of me, and I could see them with their guns going that way and yon way, and I was laying there waiting for the sheriff, and I knowed that he would come around, and I was laying down there, and I could show you just how I was laying and he shot me, and I saw him coming and I never said a word, and he never said a word neither, and he ran right up and shot, and just did miss my head, and it went right there, and I couldn't do anything but crook my hand that much, and I shot twice.''

John R. Garman, son of the appellant, says he does not think his father's mind has been right since the horse threw him; that he was then unconscious for about 24 hours; that after the accident he always walked and said his head would swim and he would not get on a horse; he was restless at night, and would wake up and get up and walk; go all over the farm; had been seen out on the road at night. He would take nervous spells and would get all torn up and would look like he did not know anything; would mutter and talk to himself, and he says he does not think his father is sane. He admits, however, that his father purchased and sold a great deal of stock; knew how to buy and sell it and make money on it; that they never took steps to have a committee appointed for him, or have any one undertake the transaction of his business. His father owned a good farm which he sold for $12,000.00. He made a profit on the farm. This was all after the time the horse threw him; his father never did any harm to himself or any one else, but that he would get it into his head, when he had these spells, that some one was going to kill him.

J. R. Turner, a son-in-law, says at times he "pronounced" him to be of unsound mind. It seemed that his mind got scattered and he complained of his head. He has seen him out on the road at night; thinks appellant got a pretty good price for his farm. He always transacted his own business; bought and sold stock and at times he would get unnerved; that he was nervous and high tempered.

J. D. Whittaker, a merchant at Livermore, saw appellant about a week before the killing; sold him his pistol; appellant said he owned a farm out from Bowling Green, and was out quite often after night and wanted protection, witness saying he had always been of a nervous disposition; complained of his head, said it seemed like some one was after him and was. wanting to kill him. The witness told him it was merely his imagination. Witness had seen him on the road at night; appellant said he was restless; thinks he got a good price for his farm; appellant generally knew what he wanted, went after it and got it.

Mrs. Smith, appellant's daughter, testified to the same general effect as the others, as to her father's restlessness after being thrown from the horse and thinking some one was going to kill him.

Mrs. J. R. Turner, a daughter, thinks her father's mind was not sound; always complained of his head since the accident from the horse, and was nervous and did not sleep well; has known him to get up and sit for hours with a gun in his hands; says her brother has been in the asylum twice. Appellant had a cousin who was of unsound mind and was in the asylum at different times.

J. P. Huggard, undertaker, at Livermore, says he would not have considered him a man of sound mind since he has known him, which has been twenty or twenty-one years; saw him a week before the killing. Appellant purchased a coffin from him and talked about it a number of times, saying that something might happen to him, and thought some one was going to kill him, and he said, "I won't be living Saturday night; they are going to kill me."

R. A. Seay, a neighbor in Bowling Green, thinks that appellant is a little off, and judges this from his actions; has seen him work in his garden at night; never saw him with a gun or rifle at night. He carried the rifle since the automobile accident; told him about purchasing the coffin; never reported to any one that he thought the appellant was crazy.

The appellant did not introduce any medical testimony as to the condition of his mind, the foregoing being the only witnesses introduced in his behalf, and we have endeavored to give the gist of their testimony.

The Commonwealth introduced a number of witnesses who were personally acquainted with the appellant. The

President of Ogden College, at Bowling Green, said that he had seen him frequently and that he was quiet and friendly; never saw him in any other attitude or spirit.

Lem Howell, deputy jailer, talked with appellant on Monday and Tuesday preceding the killing, and that he was complaining about the gate on the farm being closed and he wanted it opened; that he had known appellant three or four years; observed him frequently, and he had never seen anything to indicate that he was of unsound mind.

T. P. Smith, a constable, had known appellant for several years; had been in conversation with him and as far as he could see he was of sound mind.

B. F. Wallace, an attorney, had defended appellant in two or three cases. Had observed him around Bowling Green frequently; considered him a man of sound mind and strong will power; his business dealings with him were about six or seven years before the killing.

J. W. Hendricks, city assessor, talked with appellant about his property when he would get his list. When asked the question as to whether or not he acted in a rational way the witness said: "Yes, sir, except that he wanted to put it as low as possible."

Austin Claypool, jailer of Warren county, has known appellant for seven or eight years; never had a conversation with him except three or four times before the killing; talked to him eight or twelve times a day since then and appellant always talked to him in a rational way; thinks he is of sound mind.

W. C. Hall, acting chief of police, has known appellant for seven years; had several conversations with him in the last three months preceding August 7; never saw anything to indicate that he was of unsound mind.

Dr. Burnett Wright is the jail physician and the only doctor who testified in the case. He did not know appellant until he came to jail; that he had treated his wound about half a dozen times; that in his conversation with him he did not see anything to indicate appellant was of unsound mind; from his observation he thinks he is of sound mind.

This, in substance, is the testimony as to the condition of appellant's mind. The testimony of appellant himself does not read like that of an insane man; the recitation of events leading up to the killing, and what hap-

pened thereafter is clearly given and with remarkable detail and accuracy.

The question of appellant's mental condition was submitted to the jury under proper instructions, and no complaint is made of the instructions. Under this state of the record, viewed in the light of the testimony, the court properly submitted this question for the consideration of the jury, and we do not feel authorized to set aside the verdict as being contrary to the evidence, as contended by appellant's counsel, and unless we could so state this court is without power to disturb the verdict.

2. Admission of incompetent testimony. After Johnson had been shot a posse was formed and started in pursuit of the appellant. Carl Benson and Will Hendricks were two of the first to find him. The testimony of Hendricks is thus stated in narrative form by counsel for appellant, adhering as much as possible to the phrases used by the witness:

"We found him at the south end of them woods, in a pretty bad thicket. There was small undergrowth and briers and bushes and he was lying down in the edge of that thicket. I seen him, but he saw me first. I heard a noise in the bushes and I couldn't see where he was at, and I took my hand and parted the bushes, and saw it was him, and I saw he was making rapid efforts to shoot me. He was facing the other way when I looked in. He was scrambling and turning and raising his gun, and I saw he was going to shoot me and I didn't have time to do anything—to handle my gun, or anything, for the bushes, and I sprang on him and he shot me in the right arm and then through the two fingers, and all I could do I held him down and held the gun on him until these fellows came to me. He didn't say a word; he was just straining and struggling and trying to get that gun or knife or something. He shot me with the revolver. Neither of us said anything to the other. He was just groaning and struggling to use that gun. He saw me first and was rising and turning when I first saw him, as fast as he could, on his hands and knees like. He was on his knees when I got to him. There was no part of his body on the ground when he done the shooting. He hit this arm about the time I got to him or a second or two before. I bore him down to the ground and grabbed his gun. He had in his hand that revolver."

The testimony of Carl Benson is thus summed up by counsel: "I noticed Mr. Hendricks come down just inside the fence, towards the fence, about fifteen feet from me, when I saw him start and draw his rifle up and before he could fire there came two shots as fast as they could be fired and he just jumped then into the thicket and commenced calling for help, and Professor Clark started towards him, and as we came into the thicket Garman was lying on the ground and Hendricks partially over him, and Mr. Gray grabbed Garman's left arm and in getting hold of Mr. Garman I had my knee against his right shoulder, and Hendricks said, 'Look out for his pistol,' and Garman had his pistol in his right hand. He was then on his back with his legs doubled under him, and just as he threw his arm down he discharged, and as we lifted him up his trousers were still on fire."

It is contended that this was prejudicial error.

In Roberson's Criminal Law and Procedure, sec. 242, the author states: "So the flight or concealment of the accused after the commission of the homicide, and the action of the officers in seeking to arrest him, may be shown as circumstances furnishing a presumption of guilt; but it is competent for the accused to explain his flight, as, for instance, the apprehension of violence, or prove the causes which may have influenced him to fly." The same author, sec. 965, says: "Not only the confessions and declarations, but also the acts, conduct and appearance, of a defendant, either before or after the commission of the alleged offense, though not part of the *res gestae*, are admissible evidence against him, as indicative of the intent and motive which actuated him in the transaction with which he is charged. Thus, proof is admissible that the defendant, after the commission of the crime, fled or concealed himself as though to elude justice, or endeavored to avoid arrest, or escaped or attempted escape from custody after arrest, or was guilty of any other conduct inconsistent with his innocence."

In Basham v. Commonwealth, 87 Ky. 440, the court says that it is competent for the Commonwealth to prove that the accused, after committing the act or having been accused of it, fled or concealed himself or was guilty of any other conduct inconsistent with his innocence. This ruling is approved in Saylor v. Commonwealth, 22 Rep. 472.

Counsel relies upon the case of Shepherd v. Commonwealth, 27 Rep. 376, in support of their contention, but the testimony in that case related to crimes in no wise immediately connected with the offense for which the accused was being tried. And along the same line the case of Morris v. Commonwealth, 129 Ky. 294, referred to by appellant, in which it will be found that the court while admitting that as a general rule it is not often permissible, in order to show intent, to introduce evidence of other and distinct crimes, yet admits that where said crimes are so interwoven with the crime under trial that it cannot well be separated from it in the introduction of relevant and competent evidence, then it is admissible, and immediately following the quotation in appellant's brief the court states: ''The exceptions to the general rule against the admissibility of evidence of other and distinct offenses are in a general way stated as follows in Underhill's Work on Criminal Evidence, p. 107: '(1) If several criminal acts committed by the person on trial are so connected with respect to time and locality that they form an inseparable transaction, and a complete account of the offense charged in the indictment cannot be given without detailing the particulars of such other acts, evidence of any or all of the component parts thereof is admissible to prove the whole general plan. (2) When the commission of the act charged in the indictment is practically admitted by the accused, who seeks to avoid criminal responsibility therefor by relying on a lack of intent or want of guilty knowledge, evidence of the commission by him of similar independent offenses before or after that upon which he is being tried, and having no apparent connection  therewith, is admissible to prove such intent or knowledge.' ''

The testimony of Hendricks and Benson recited details so intimately connected with the killing of Johnson that we do not see how the court could well have eliminated it; nor can we say the court committed prejudicial error in the admission of this testimony.

The appellant had sought to evade his pursuers, and had picked out, as he says, ''a high place where I could see clear to my house,'' and we believe the evidence as to the second shooting was competent as being so connected with respect to the time and locality of the killing of Johnson as to form an inseparable transaction, and also as being connected with the flight and capture of appellant.

3. Did the court properly admonish the jury as to the purpose of the introduction of this testimony? While the witness Hendricks was testifying counsel for defendant interposed an objection to his testimony, and the court gave this admonition: "The jury will not consider, of course, anything in connection with this man but the attitude." It is claimed this admonition was meaningless and did not enable the jury to get any well defined or proper idea of what was intended or meant.

Perhaps the language used by the court was not as explicit as it could have been, and yet we do not think that the language used was prejudicial. The word attitude, as defined in Webster's International Dictionary is, "Position as indicating action, feeling or mood; the object of an attitude is to set forth or exhibit some internal feeling; as an attitude of wonder, admiration or grief, etc."

It is usual in admonishing juries relative to testimony of this nature to tell them the testimony is not admitted to show accused guilty of the crime for which he is being tried, but only competent for the purpose of establishing some other fact pertinent to the trial. The lower court did tell the jury that the only thing they could consider in connection with the witness Hendricks was the attitude. In other words, that no part of his testimony was competent as showing the guilt or innocence of the appellant, and if the use of the word "attitude" was inapt the jury could not have misunderstood the other part of the admonition, viz.: that they were not to consider anything else. We do not think appellant was prejudiced in any way by the admonition.

This is an unusual case, a man 80 years of age given the death penalty. This court is one of appellate jurisdiction. Under sec. 340 of the Criminal Code it is provided: "A judgment of conviction shall be reversed for any error of law appearing on the record when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

But upon a consideration of the whole case we are of the opinion that the substantial rights of appellant have not been prejudiced and therefore we are constrained to order an affirmance of the judgment below.

Should the sheriff be satisfied that there are reasonable grounds for believing appellant insane he is auth-

orized to summon a jury to inquire into this question, and if the inquisition find him insane, this will suspend the execution of the judgment. Criminal Code, secs. 295, 296.

The whole court sitting.