## Gaines v. Commonwealth.

(Decided February 2, 1932.)

R. W. LISANBY and MARSHALL P. ELDRED for appellant.

J. W. CAMMACK, Attorney General, and M. B. HOLIFIELD, Assistant Attorney General, for appellee.

238

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appellant, Richard Gaines, colored, has been
condemned to death for the murder of Bud Wilson, also
colored, which occurred in Princeton in August, 1930.
According to the appellant, on the evening before, he and
the deceased had had a quarrel over $5 he had lent Wil-
son, to secure which he had promised to pawn his watch.
In the morning or early afternoon of the day of the kill-
ing, Gaines came into a poolroom where Wilson was and
asked to let him see his pistol. He says that Wilson was
flourishing it, but all other witnesses say he had it under
the bib or in the pocket of his overalls. Before handing
the pistol to Gaines, Wilson removed the cartridges,
remarking that he always did so before he let a man have
it. Several testify that, after getting the weapon Gaines
cursed and abused Wilson, who was subdued and intimi-
dated and offered no resistance whatever. There is evi-
dence also that Gaines had an open knife at Wilson's
throat during this time. Gaines left the poolroom and
shortly thereafter Hollowell met him on the street and
asked, "Did you give that boy his pistol?" He said he
had not, because "he is mad at me now and is going to
have me arrested." However, Gaines did turn over the
pistol to Boyd, a restaurant keeper, to be given to Wil-
son, which was done. Later in the afternoon, Gaines was
seen approaching the poolroom with a shotgun, and Wil-
son, who was sitting outside, upon being warned, went
inside. Gaines went in through the back door, and, point-
ing the gun at Wilson, demanded that he again turn over
his pistol to him, which he did, but without unloading it
as before. Gaines fired the pistol in the direction of Wil-
son, and the bullet went into the floor. There was a
scattering of the crowd. Then the two men were seen
going up an alley toward the home of Savannah Woods,
with whom Gaines had been living. He had the shotgun
in one hand and Wilson's pistol in the other. Wilson
was heard to say, "I don't bother nobody," to which
Gaines responded, "That is all right; there are two or
three sons of bitches I want to kill." Upon arrival at
the home of the woman, Gaines ordered him to go on.
She was lying on the bed sick. Gaines demanded that
she get up and that Wilson should take a seat in a cer-
tain chair. Her testimony as to what then occured is as
follows: "Said 'Give me your watch,' and Mr. Bud

said 'I will give you anything I got, don't shoot me, I am a honest man.' Then he told me to stand over there and lock up with Mr. Bud and I says 'I ain't going to do it.' And he says 'Get on over there,' and he says, 'Bud, God damn you, I am going to kill you,' and Mr. Bud says, 'Don't kill me, I am a honest man; I will give you anything I got,' and about that time the gun went boom, and Mr. Bud was going over this way (indicating falling), and he says 'Richard, you ought not to have done me that way.' I run over to Miss Nannie Hollowell's and run through the house and got under her house.''

James Matchen had gone on the porch and endeavored to quiet Gaines. At the point of the gun he made him give him a cigarette and then light it. He then told Matchen, ''You get to hell on away from here,'' who, as he turned to go, heard Gaines say: ''Get up Bud, God damn you, I am going to kill you,'' and then the gun went off. Another witness says a pistol was fired and just then Savannah Woods ran out screaming through the yard of Hollowell, two doors below, and on through his house and under it. A witness went immediately to the place of the shooting and found Wilson dead, lying close to a chair and with no weapon about him. Gaines ran after the Woods woman and shot at her, and one witness says he shot and wounded another woman on the way. Hollowell told Gaines not to come in his yard; Gaines paid no attention to him and demanded that he turn her out, declaring that he was going to kill her. He fired at Hollowell, but missed him, and then pointed his shotgun at him, when Hollowell fled for safety. Later Gaines was found at the edge of a sink hole some distance from the town, and as the officer approached raised up with the shotgun, but was covered by the officers, and he surrendered.

The defendant admitted the killing, and testified that in the poolroom that morning he and the deceased had renewed the argument of the previous day over the $5 loan; that Wilson was flourishing his pistol and he had gotten possession of it in fear of him; that then Wilson, with an oath, demanded its return, and accompanied the demand with an attack upon him with an open knife, which he avoided. He left the poolroom, followed by Wilson, and they went together down an alley still arguing and scuffling, each one having his knife out. He took the pistol to Boyd to be returned to Wilson when he

should call for it. About 2:30 in the afternoon he saw Wilson coming down the street, and, knowing that he was going after his pistol, he secured a shotgun for the purpose of going hunting because he didn't want to come in contact with Wilson any more. He spent some two hours out hunting, or, as he later testified, in training a young bird dog. On his way home late in the afternoon he stopped at the poolroom, entered through the back door, and walked to the front door. He saw nobody there, but, as he turned to go back through the room, Wilson came from behind the door, cursed him, and shot at him, with the declaration of a purpose to kill him. He tried to pacify Wilson, but could not. However, they walked together down the alley, arguing and fussing, but stopped on the way to drink a half pint of whisky which Wilson produced and invited him to share. When they got in the house of Savannah Woods, Wilson was still in a bad humor. The defendant contradicted the version of what occurred, as given by Matchen and the Woods woman. His testimony as to the immediate occurrence is this:

"We talked about the watch and then Bud finally decided to give me the watch. He takes his left hand and his right hand he put in the bib of his overalls and reached me the watch with his left hand, and I reached with my left hand and taken the watch and held the shot gun in my right hand, and then I turned from Bud just barely turned from him and started to the door and I hadn't got turned around from him until he out with his pistol and we begin shooting."

Gaines took the pistol out of Wilson's hand as he was in the act of falling and walked on down the street. He testified that if he followed the Woods woman and shot at her or Hollowell he did not know anything about it. He remembered he went down a certain street and up the alley to a cousin's house, but he didn't know how he got out in the field where he was arrested. He knew he was hiding from the officers because he was scared, and attributes his lack of memory to the whiskey which had been given him by Wilson, and perhaps to other drinks taken in the poolroom during the afternoon. He remembers the deputy sheriff arresting him, but denies that he offered any resistance. The only other witness introduced by the defendant was a colored undertaker

who testified that there was a two-inch gunshot hole just above Wilson's heart. From this an instantaneous death is deduced, which fact it is said contradicts the evidence of Savannah Woods as to the remark made by Wilson after being shot.

In rebuttal, several witnesses contradicted most of the defendant's evidence.

Upon this appeal, the appellant's counsel argues that the story by the commonwealth's witnesses was an improbable and unnatural one; that their testimony was so inconsistent and contradictory as to show collusion and to make it of no value; therefore, that as a matter of law he was entitled to a peremptory instruction of not guilty. He also claims this right because of the introduction of evidence of other crimes upon the same theory that would have rendered the indictment demurrable had their commission been charged therein. The evidence is unusually free from contradictions in the material and essential features. Even in the minor particulars, the witnesses substantially agree as to what occurred, although each one states a little differently the language used by the parties, and some of them omit part of the details. Of course, it was for the jury to weigh the evidence and act upon it. The other ground is wholly without merit, if for no other reason than that next discussed.

The most serious complaint is that the court erred to the prejudice of the defendant's substantial rights by permitting the introduction of evidence as to what Gaines said and did, and the other offenses committed by him immediately after he shot Wilson. It is claimed with special emphasis that the evidence respecting his shooting at the Woods woman while fleeing from him, shooting and wounding the other woman, and firing at Hollowell while he was remonstrating with him, offends the rule that offenses or crimes separate and distinct from the one upon which the defendant is being tried may not be introduced except for certain purposes, in none of which classifications it is said this evidence can be placed.

The uniform rule respecting the admission of evidence of other offenses has been many times stated. Keller v. Commonwealth, 230 Ky. 815, 20 S. W. (2d) 998; Sneed v. Commonwealth, 236 Ky. 838, 34 S. W. (2d) 724, and cases cited. No complaint is made as to the admission of evidence as to what had occurred in the poolroom and

in the alley previous to the killing, under the tacit concession of competency as showing an intent or state of mind on the part of the accused. We conclude that the evidence as to what he did immediately after the killing was also admissible as coming within the exceptions to the rule of exclusion. The motive and malice which induced the defendant to kill Wilson still controlled and possessed him. Its force was still operating upon him without interruption, and his conduct was so commingled with the principal crime as to make the picture of the occurrence incomplete without a recitation of those acts. It was proper to be heard for a correct understanding and appreciation of the nature and quality of the principal act. Kelly v. Commonwealth, 237 Ky. 691, 36 S. W. (2d) 344. Moreover, the attempt to kill Savannah Woods may have been made in order to dispose of her as an eyewitness to the crime which the defendant had perpetrated, and thereby have concealed his guilt.

We may note a few cases in which under similar conditions evidence of other crimes was held competent.

In May v. Commonwealth, 153 Ky. 151, 154 S. W. 1074, affirming a judgment carrying a death penalty for the murder of a woman, evidence that immediately before the accused had killed her husband and right afterward pursued an eyewitness across a field and shot him. No complaint was made of the introduction of this last act, and, as to the killing of the husband, it was held competent evidence as being so interwoven with it as to be inseparable, a part of the res gestae, and it is said had there been a greater interval of time between the two acts it would have been competent as showing a motive.

In Garman v. Commonwealth, 183 Ky. 455, 209 S. W. 528, also a death case, after the killing, the accused escaped, and, from a point of advantage, shot one of his pursuers; the evidence thereof was held competent as being so connected with respect to the time and locality of the crime for which he was being tried as to make it an inseparable transaction, and also because connected with his flight and escape.

In Fallis v. Commonwealth, 197 Ky. 313, 247 S. W. 23, the accused, after shooting a policeman, barricaded himself in his home several squares away, and some 30 or 40 minutes afterward shot two other officers in resisting arrest. The evidence as to the latter crime was

held competent under the rule of admissibility of evidence of an evasion and resistance of arrest with the attending circumstances as showing the state of mind and motive actuating the accused at the time of the commission of the first offense.

In Wallace v. Commonwealth, 207 Ky. 122, 268 S. W. 809, the accused had shot a police officer who had him under arrest, and, as he fled, shot at several other officers, wounding two of them. Holding that each constituted a separate offense, and that the conviction for one crime was therefore not a bar to the conviction of the others, it was further held that evidence of all of the offenses was competent because they were so connected in point of time that the evidence relating to them could not be separated.

In Crenshaw v. Commonwealth, 227 Ky. 223, 12 S. W. (2d) 336, a number of men had set fire to a house and shot and wounded several of the inmates, from which wounds one of them died. Upon their trial for murder, evidence was admitted that about a quarter of a mile away from the scene of the crime some of the accused men met up with three of the parties who had escaped from the burning building and there shot at them. This evidence was held properly admitted.

See, also, for statements and application of the rule, Greenwell v. Commonwealth, 125 Ky. 192, 100 S. W. 852, 30 Ky. Law Rep. 1282; and Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714.

As further grounds for reversal, it is urged that the court prejudiced the defendant's rights when, in ruling upon the admission of the foregoing evidence, he stated: "The court holds that this is all one transaction." Later, after the jury had been considering the case for awhile, its foreman, in the presence of others, asked the court "If it was true that in the event of a life sentence being imposed, that under some conditions would it be possible for the defendant to be paroled?" The court stated that it had given the jury the whole law of the case, and could not answer the question. As the jury turned back to its room, the court asked if it was likely that they would agree in a few minutes, and the foreman responded, "We cannot answer that question." Within a short time the verdict was returned.

Counsel bases his argument of prejudicial error upon the case of Postell v. Commonwealth, 174 Ky. 272, 192 S. W. 39. The facts of the two cases are very different. The first statement of the judge in this case was addressed to counsel who had made the objection, and certainly could not have affected the verdict of the jury in any way. It cannot be construed as indicating an acceptance of the evidence as true, as was the admonition given the jury in the Postell Case. In the second instance, the court made a very proper response to the inquiry concerning the parole law. What else could he have properly said? In the Postell Case, the language of the court was in the nature of an instruction to the effect that the accused would be subject to parole. It was held that this likely influenced the jury in returning the death penalty, although the case was not reversed on that ground, because the occurrence was not shown in the bill of exceptions.

The record discloses that appointed counsel have diligently and conscientiously looked after the rights of the accused. The jury, after a full and fair trial, found the defendant guilty and held that he ought to forfeit his life for his crime. The serious responsibility resting upon this court has demanded, and it has given, a careful consideration of the record for the purpose of determining whether it contained any error either of law or of fact requiring the judgment passed upon the accused to be reversed. We have found none, and are of the opinion that the accused has had a fair and impartial trial, and that his rights have been fully protected.

Wherefore the judgment is affirmed.

Whole court sitting.